**Herbert Dean MAXWELL, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 47689.**

Court of Criminal Appeals of Texas.

April 3, 1974.

Rehearing Denied May 29, 1974.

Raymon Jordan, Houston, for appellant.

Carol S. Vance, Dist. Atty., James Brough, Ted Poe and George Karam, Asst. Dist. Attys., Houston, Jim D. Vollers, State's Atty., Austin, for the State.

OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for felony theft wherein the jury assessed the punishment of two (2) years, probated.

The indictment charged the felony offense of theft of twelve coils of ¾ inch copper tubing, twenty-five ¾ inch brass curb stops, and twenty ¾ inch brass corporation stops.

In his first two grounds of error appellant challenges the sufficiency of the evidence to sustain the conviction.

Leon Morris Cohen, President of Jones Supply Co., Inc., testified that his company records reflected that on August 17, 1971, the items listed in the indictment were sold to the I.O.I. Systems Company and Woodrow Wilson signed the receipt for the same.[1] The selling price for such items was $915.45.[2] He related that Wilson had been introduced to "our people" by another employee of I.O.I. Systems, who informed them Wilson was authorized to pick up material and supplies as needed by I.O.I. Systems. Cohen testified that if he had known on August 17, 1971, that Wilson had no such authority the transaction in question would not have been completed. He acknowledged, however, that the items had been given to Wilson under the impression I.O.I. Systems was purchasing the same.

John Wayne Thompson, an employee of the Jones Supply Company, testified that several months prior to August 17th Roosevelt Duncan, also known as Willie X, an employee of the I.O.I. Systems, had introduced Woodrow Wilson to him, told him Wilson was an I.O.I. employee and was authorized to pick up material for I.O.I. Thompson related he checked with I.O.I. and was told it was "okay" and that Wilson had come in on several occasions to pick up material. He testified he was present on August 17th when the items described in the indictment were loaded onto a red 1969 or 1970 truck being driven by Wilson.

Sam Caliva, President of I.O.I. Systems, testified Wilson was an employee of his organization from April 28th to May 18, 1971, and from July 27th to July 28, 1971, and that Roosevelt Duncan was also an employee.

Caliva testified he began checking on some invoices on August 19th and asked Duncan to contact and bring Wilson in on the pretext he was needed for work. When Wilson arrived, he was questioned by Detective Elkin of the Houston Police, and subsequently, Caliva, Wilson and Elkin all went to the appellant's junk yard or place of business at 3615 Crane. From there, after a conversation between Elkin and appellant, they went to Gulf Metals, where they found some brand new corporation and curb stops with the seal of the Hays Company on them and Elkin took some into possession for evidence. The copper found was chopped up and couldn't be identified.

Detective Elkin described the above events as occurring on August 18th. He revealed that after talking to Wilson at I.O.I. he went with others to appellant's business where he observed a red 1969 Ford truck and that, following a conversation with the appellant, he went to Gulf Metals where they found new Hays brand corporation and curb stops.

Bernard Schwartzberg, general manager of Gulf Metal Industries, testified that on August 17, 1971, the appellant Maxwell, accompanied by another man, sold him some "No. 1 copper" and red brass for $595.92 and that he paid $450.00 immediately so the appellant could pay his supplier. He related he had had a number of transactions with the appellant, who was one of forty dealers from whom he purchased scrap metal on a regular basis.

Woodrow Wilson, 21, testified that he was raised in Louisiana speaking French, that he only went to the third grade, and learned the English he knew after he arrived in Houston several years before the events in question. He claimed he could sign his name, but could not read or write. He related he was looking for a job and was hired by the appellant, to whom he

---

1. He described the brass curb stops and corporation stops as having been manufactured by the Hays Manufacturing Company, Erie, Pennsylvania, and related that the company's name was stamped on each item.

2. Cohen related the payment arrangement his company had with I.O.I. Systems was to "invoice them . . . due thirty days from the date of invoice." He denied that on the occasion in question his company had ever been paid for the transaction in question.

had explained his former employment with I.O.I.; that the appellant would give him "a receipt" with something written on it and direct him to go in appellant's red truck to Jones Supply or Utility Supply and pick up items such as copper tubing, etc., and that he would sign for such items and deliver them to the appellant. Wilson testified he knew it was wrong to steal, but he didn't know what he was doing was wrong, that he didn't understand how the system worked or who paid for the items he secured, even though he had previously picked up needed items for I.O.I. and a subcontractor named Collins.

He denied he had borrowed a truck from a Murphy Richards and had merely sold the items listed in the indictment to the appellant.

Dr. Jerome Brown, a clinical psychologist, testified that he had examined Wilson and found he had an "IX (sic) of 52," was mentally retarded and had the mental ability of a six or eight year old child, and did not have the ability to form the intent to commit a crime.

Roosevelt Duncan, testifying for the defense, acknowledged that Wilson had been a fellow employee at I.O.I. and that he and Wilson often sold old copper to the appellant, the copper being from jobs where the old copper was being abandoned or left in the ground.

Murphy Richards testified he met Wilson for the first time on August 5, 1971, and Wilson paid him $10.00 for the use of his truck, and that he drove Wilson on that date to Jones Supply and to Utility Supply, where a number of items were picked up and were then unloaded at the appellant's place of business.

Joseph Porter testified he lived across the street from the appellant's business establishment, and that on an occasion in August, 1971, Wilson had paid him $10.00 to unload some copper tubing at the appellant's place; that Wilson did not appear to know the appellant was in a red truck with another man, such truck being similar to appellant's truck.

James Booker testified that on an occasion in August, 1971, he loaned money to the appellant so that the appellant could purchase some copper tubing from Wilson.

Appellant's wife testified she helped her husband operate his business, that they never had any employees, and that she saw Wilson for the first time on August 5, 1971, when he came inquiring about "the man who buys metal." She recalled one occasion when Wilson asked to borrow her husband's truck, claiming his brother's truck had broken down.

Testifying, appellant denied he had ever employed Wilson, and said he met Wilson on August 5th when he purchased some copper from Wilson which had been hauled in Murphy Richard's truck. He related he had other purchases the next day and through August 17, 1971, the day before his arrest. He acknowledged he sold the items purchased on August 17th to Gulf Metals. He denied that Wilson was an employee or that he had used Wilson in any way to obtain the items involved.

In rebuttal the State called Woodrow Wilson's brother, Colton, who testified Woodrow was employed by the appellant and that he (Colton) took Woodrow to work on a number of days.

Without objection, the court charged the jury at the guilt stage of the trial to find the appellant guilty if they found there was a taking without consent. The court also instructed the jury "that if anyone fraudulently procures another person innocent of any fraudulent intent to take property for him, it is a taking through an innocent agent and is a taking by the person who procured the taking by the innocent agent." The law was then applied to the facts in the case.

On appeal appellant complains that the evidence is insufficient to sustain the conviction because there was no showing that Wilson was an innocent agent.

■ Appellant acknowledges that a taking by an accused who fraudulently procures a person innocent of any fraudulent intent to take property for him is a taking through an innocent agent, and that a taking by an innocent agent is a taking by the accused. Heard v. State, 160 Tex.Cr.R. 88, 267 S.W.2d 150 (1954).[3]

Citing these same authorities, the State urges that the appellant was constructively present at the time of the alleged theft.

Passing over appellant's contention that Wilson was not an innocent agent, we turn to his other contention regarding the sufficiency of the evidence.

■ Appellant contends that he was charged with ordinary theft under Article 1410, Vernon's Ann.P.C., and that this was the offense which was submitted to the jury in the court's charge and that the verdict cannot stand because the undisputed evidence shows that the taking was with consent, not without consent.

Articles 1410 and 1413, Vernon's Ann.P. C., denounce separate modes of committing the offense of theft.

Article 1410, supra, provides as follows:

" 'Theft' is the fraudulent taking of corporeal personal property belonging to another from his possession, or from the possession of some person holding the same for him, *without his consent*, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking." (Emphasis supplied)

Article 1413, supra, provides that:

"The taking must be wrongful, so that if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft, but if the taking, though originally lawful, was obtained by any false pretext, or with any intent to deprive the owner of the value thereof, and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is complete."

In the charge in the instant case the court defined "theft" in the terms of Article 1410, supra, and in applying the law to facts instructed the jury:

"Now, if you believe from the evidence beyond a reasonable doubt that the property mentioned in the indictment belonged to Leon Morris Cohen and was of the value of Fifty Dollars or over and was in his possession, and that on or about the time and at the place stated in the indictment, the defendant did fraudulently take said property or a part thereof from the possession of said Leon Morris Cohen *without his consent* and with the intent to deprive him of the said property and its value and to appropriate the same to the defendant's use and benefit, then you will find the defendant guilty *as charged in the indictment* and so say by your verdict." (Emphasis supplied)

"The charge given authorized and confined the conviction of the appellant to the offense of theft as defined in Art. 1410, supra. Such a charge was outside of and not supported by the evidence for the reason that it required the jury to find that the money was taken without the consent of the owner. The court, under the evidence, was not authorized to submit any theory in the charge except the modes of committing the offense of theft as defined by Art. 1413, supra." Finley v. State, 440 S.W.2d 849 (Tex.Cr.App.1969).

3. In Spivey v. State, 144 Tex.Cr.R. 432, 164 S.W.2d 668, 672, quoted with approval in Heard, supra, it was written:
"In a legal sense, defendant was present when the act was done if he fraudulently caused that act to be done by an innocent agent although in fact he was in a different county or state."

Since the original taking was with consent, the conviction cannot rest upon the offense of theft as defined by Article 1410, supra. See Finley v. State, supra.

The judgment is reversed and the cause remanded.